IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 27, 2015


**JAMES ARTHUR JOHNSON v. STATE OF TENNESSEE**


**Appeal from the Criminal Court for Davidson County**
**No. 2007-A-129     Mark J. Fishburn, Judge**

_____


**No. M2015-00655-CCA-R3-PC – Filed November 20, 2015**

_____


A Davidson County jury found the Petitioner, James Arthur Johnson, guilty of two counts of first degree felony murder and one count of aggravated robbery. The trial court sentenced the Petitioner to a total effective sentence of life plus eleven years in the Tennessee Department of Correction. On appeal, this Court affirmed the Petitioner's convictions and sentence. *State v. James Arthur Johnson*, No. M2009-01147-CCA-R3-CD, 2010 WL 3323796, at *1 (Tenn. Crim. App., at Nashville, Aug. 24, 2010), *perm. app. denied* (Tenn. August 24, 2010). The Petitioner filed a petition seeking post-conviction relief based upon his allegation that he received the ineffective assistance of counsel at trial. The post-conviction court denied the petition after a hearing. On appeal, after a thorough review of the record and applicable law, we affirm the post-conviction court's judgment.


**Tenn. R. App. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and D. KELLY THOMAS, JR., JJ., joined.

Ryan C. Caldwell, Nashville, Tennessee, for the appellant, James Arthur Johnson.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; Glenn R. Funk, District Attorney General; and Rob McGuire, Assistant District Attorney General, for the appellee, State of Tennessee.


**OPINION**
**I. Facts**

A Davidson County grand jury indicted the Petitioner for two counts of first degree premeditated murder, two counts of first degree felony murder, and one count of robbery. On direct appeal, this Court summarized the facts of these charges as follows:

> On the night of June 18, 2006, Leonard Swann of the Robertson County Sheriff's Department was working an off-duty security assignment at Kroger grocery store on Eighth Avenue and Monroe Street in Nashville. As he was standing outside the store, Swann heard an estimated eleven to thirteen gunshots fired, and seconds later, he observed Marcus Edmondson running across the Kroger parking lot holding a handgun. Swann testified that Edmondson was bleeding and bending over as he ran and repetitively stating that he had been shot. Edmondson then fell in a grassy area at the end of the parking lot, and an ambulance arrived shortly thereafter. Edmondson died at Vanderbilt Medical Center as a result of his injuries.

> After the ambulance departed with Edmondson, Detective Warren Fleak of the Nashville Metropolitan Police Department arrived at the scene to find the deceased body of Ricky McCorkle in an alleyway behind the Kroger. About twenty-five feet away from McCorkle's body, thirteen .22 caliber cartridge casings were found on the ground. Detective Fleak stated that officers found a water bottle and a Swisher Sweet cigar box containing marijuana when approaching the front of the Kroger from the location of McCorkle's body. In front of the store, officers found a Lorcin 380 semiautomatic handgun, an empty magazine belonging to that gun, and a cell phone.

> Detective Leonard Peck of the Nashville Metropolitan Police Department was assigned to investigate the scene at approximately 9:30 P.M. on the night of the incident. Detective Peck returned to the scene the following morning and found McCorkle's wallet and driver's license. After searching McCorkle's phone records, Detective Peck discovered that McCorkle had dialed the phone number of Rodney Williams several times directly before the time of the shootings. After interviewing Williams, Detective Peck developed the [Petitioner] as a suspect. After receiving a message that Detective Peck wished to speak to him, the [Petitioner] voluntarily went to the police station.

In a recorded interview that was played for the jury, the [Petitioner] told Detective Peck that Rodney Williams had called the victims and made plans to meet them behind the Kroger to purchase drugs. The [Petitioner] stated that the original plan was to purchase drugs and that he had no intention to harm anybody. However, he also stated that Williams discussed robbing the victims for their drugs and money before arriving at the Kroger. The [Petitioner] stated that he was to be the lookout and hoped to be paid for his role. Specifically, after being asked, "So, when Rodney did the robbery, you were hoping to get paid from the robbery," the [Petitioner] answered, "Yes." At trial, the State asked Detective Peck what that statement meant to him, and over objection by the [Petitioner], Detective Peck answered, "That means to me that he's a willing participant."

The [Petitioner] stated that after he arrived at the Kroger parking lot, Williams left the car with the .22 caliber rifle while he remained in the vehicle. The [Petitioner] then heard several gunshots, and Williams returned to the car with McCorkle's wallet and stated, "They tried to kill me." After leaving the Kroger, Williams left the rifle with the [Petitioner], who gave it to Christopher Phillips. Although Phillips did not possess the weapon when questioned, officers discovered the rifle wrapped in a plastic bag in a dumpster off Jefferson Street.

Dr. Thomas Deering, assistant medical examiner for the State Medical Examiner's Office in Nashville, performed autopsies on both of the victims' bodies and served as a witness for the State at trial. Dr. Deering testified that McCorkle had two gunshot wounds on the lower left side of his back. McCorkle had no exit wounds. One bullet had passed through the victim's spinal cord and lodged in his right lung, while the other passed through the left lung, heart, and into the chest plate. Dr. Deering stated that the bullet that passed through the spinal cord was possibly fatal and that the bullet to the heart was certainly fatal. Dr. Deering concluded that McCorkle had been shot in the back and that the cause of his death was multiple gunshot wounds. Dr. Deering added that McCorkle's blood tested positive for THC, indicating that he had recently used marijuana.

Dr. Deering stated that Edmondson had one gunshot wound on his right lower back, two gunshot wounds on his scrotum, and one gunshot wound on his thigh. Dr. Deering had difficulty analyzing some of Edmondson's injuries because surgeons had altered many of his organs in

3

an attempt to save him. However, Dr. Deering did find two bullets in the victim's abdomen and concluded that it appeared the victim had bled to death after being shot in the back. Like McCorkle, Edmondson also tested positive for THC.

Steve Scott, a ballistics and firearms identification expert who works for the Tennessee Bureau of Investigation, examined both the Lorcin handgun found at the scene and the .22 rifle found in the dumpster off Jefferson Street. Scott also received five bullets taken from the bodies of the victims and the thirteen cartridge casings found at the crime scene. Although Scott received the Lorcin with one cartridge, he was unable to test fire the pistol due to a buildup of oil and lubricant that would not allow it to properly function. Scott was able to test fire the .22 rifle. Due to the cheap quality of the rifle and the soft nature of the .22 caliber bullets, Scott was unable to determine whether the bullets taken from the victims' bodies were shot from the rifle. However, Scott was able to determine with "no doubt at all" that the thirteen shell casings found at the scene were fired from the rifle.

*Johnson*, 2010 WL 3323796, at *1-2. After hearing the evidence, the jury convicted the Petitioner of two counts of first degree felony murder and one count of aggravated robbery. The trial court sentenced the Petitioner to serve an effective sentence of life plus eleven years in the Tennessee Department of Correction.

The Petitioner filed a petition for post-conviction relief, asserting that he had received ineffective assistance of counsel. The post-conviction court held a hearing on the petition, and the parties presented the following evidence: The Petitioner testified that he met with his attorney ("Counsel") five or six times before trial at the local detention center. The Petitioner confirmed that Counsel provided him with a copy of the discovery materials and hired an investigator. He stated that the investigator revealed "a

lot of inconsistencies in the testimony of the other defendant." The Petitioner could not recall specifically any of the inconsistencies.

The Petitioner testified that, at the time of his trial, he "didn't know anything about the law" but was now more well-informed. The Petitioner stated that Counsel did not develop a reasonable trial strategy. He said that he was unaware of any defense strategy but that he was "hoping to go home" following the trial.

The Petitioner testified that Counsel should have filed a motion to suppress his statement to the police, although he agreed that he was not under arrest at the time he gave the statement. The Petitioner stated that his "main" complaint was that Counsel was unprepared, lodged few objections, and failed to have character witnesses speak on the Petitioner's behalf.

On cross-examination, the Petitioner agreed that Counsel told him that he had the right to testify but that Counsel advised him not to testify. The Petitioner confirmed that he understood that the decision of whether to testify or not was his decision. About his statement to the police, the Petitioner said he felt "coerced" because the detective told him, "you ain't got nothin' to worry about, you really a witness." Based upon this statement, the Petitioner admitted to being in the car. The Defendant agreed that the detective read him *Miranda* rights but that he was not under arrest at the time of his

5

statement. The Petitioner maintained that he only provided his statement to the police because he believed he was going to be a witness. The Petitioner agreed that Counsel argued to the jury that the Petitioner's presence in the car did not mean he was guilty of felony murder. He agreed that Counsel also cross-examined Detective Peck about the nature of the Petitioner's statement and how it was obtained.

Counsel testified that he was appointed to represent the Petitioner in criminal court and accessed the State's file in the Petitioner's case. He confirmed that he had both the recording and the transcript of the Petitioner's statement to Detective Peck. Based upon his review of the Petitioner's statement and discovery, Counsel did not believe he had a basis on which to raise a suppression challenge. Counsel explained that the Petitioner voluntarily gave the statement and was free to leave. The interview was not a custodial interrogation, thus, Counsel did not file a suppression motion.

Counsel testified that he discussed the Petitioner's right to testify "extensively" with the Petitioner. Counsel said that he did not advise clients whether to testify; he provided clients with the "pros and cons of it." He said that it was likely his opinion in this case was that the Petitioner's testimony would not be helpful. Counsel said that he explained to the Petitioner that it was the Petitioner's decision alone to testify, and Counsel believed that the Petitioner understood.

6

Counsel testified that his trial strategy was to attack the State's premise that the Petitioner was an active participant in these crimes and argue instead that the Petitioner was merely present. Counsel said that the defense theory was that there was no intent for a robbery, it was a drug deal and that the co-defendants, while on the scene, made the decision to change the course of events without the Petitioner's knowledge. Counsel said that he discussed this strategy with the Petitioner. Counsel stated that the Petitioner did not provide him with any witnesses nor did his investigator uncover any helpful witnesses. As for character witnesses, the Petitioner had chosen not to testify, so it was unlikely a character witness would be admissible at trial.

On cross-examination, Counsel testified that the Petitioner never stated to him an interest in testifying. Counsel recalled that he laid out the Petitioner's right to testify for him, as well as Counsel's opinion, and the Petitioner made the decision. Counsel said that the Petitioner never expressed any interest in testifying nor did the two ever have a "debate" about whether or not the Petitioner should testify.

In a subsequent written order, the post-conviction court denied the Petitioner post-conviction relief. The post-conviction court found that there was no legal basis upon which Counsel could have filed a suppression motion because the Petitioner had been read his *Miranda* rights and the interview was non-custodial. As to the Petitioner's allegation that Counsel failed to communicate with him, the post-conviction court

specifically found that Counsel had "reasonable communication" with the Petitioner during all phases of preparing for the trial. Finally the post-conviction court found that the Petitioner "waived his right to testify knowingly and voluntarily without any undue influence." The post-conviction court concluded that the Petitioner had failed to establish any deficiency in his representation. It is from this judgment that the Petitioner appeals.

## II. Analysis

On appeal, the Petitioner asserts that he received the ineffective assistance of counsel. He maintains that Counsel failed to mount a meaningful defense, failed to file a suppression motion, failed to call any witnesses, and improperly advised him not to testify. The State responds that the Petitioner has failed to show he is entitled to post-conviction relief. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be

resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

9

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland,* 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally

10

compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad,* 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

The evidence does not preponderate against the post-conviction court's findings. The Petitioner contends that Counsel failed to provide a meaningful defense. Counsel testified that his strategy was to show that, although the Petitioner was present, the Petitioner did not share the intent or have knowledge of the others perpetrators' plans.

11

Counsel testified that the Petitioner was fully aware of the trial strategy, and, at the post-conviction hearing, the Petitioner's statements were consistent with a theory that he was merely present and not a participant in the crime.

The Petitioner next contends that Counsel was ineffective for failing to file a motion to suppress his statement to the police. The Petitioner testified at the post-conviction hearing that his interview with Detective Peck was a non-custodial interview and that, even so, Detective Peck administered the *Miranda* rights. There is no evidence in the record to support a conclusion that Counsel would have prevailed on a suppression motion, and the Petitioner provides no reasoning in support of this contention.

The Petitioner next asserts that Counsel failed to call any witnesses to establish his defense. Counsel testified that his investigator did not find any witnesses that would be helpful to the defense and the Petitioner did not provide any names of potential witnesses. Consistent with Counsel's testimony that the Petitioner did not provide the names of potential witnesses, the Petitioner did not present any witnesses at the post-conviction hearing in support of this contention. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) (holding that "[w]hen a [petitioner] contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the [petitioner] at the evidentiary hearing.")

Finally, the Petitioner contends that Counsel was ineffective because he improperly advised him not to testify. Counsel testified that he discussed the Petitioner's right to testify with him. Counsel recalled that he and the Petitioner discussed "extensively" the issue of testifying at trial. Counsel stated that he did not think it best for the Petitioner to testify but that it was the Petitioner's decision whether or not to testify. The post-conviction court found Counsel's testimony credible. The Petitioner also testified at the post-conviction hearing that he understood that the decision of whether to testify at trial was his decision. The record of the *Momon* hearing supports Counsel's testimony and the post-conviction court's findings on this issue. Therefore, the evidence does not preponderate against the post-conviction court's finding that Counsel was not ineffective in this regard.

Accordingly, the Petitioner has failed to show by clear and convincing evidence that Counsel was deficient and that any alleged deficiency prejudiced the defense. The Petitioner is not entitled to relief.

## III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied the Petitioner's petition for post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE